**MEMBERS FOR A BETTER UNION, Carlos Guzman, Dominick Bentivegna and Frank Colon, Plaintiffs,**

v.

**Gus BEVONA, as President of Local 32B–32J, Service Employees International Union, AFL–CIO, Defendant.**

**No. 97 CIV. 0980.**

United States District Court, S.D. New York.

Dec. 15, 1997.

---

the present case."  Pl. Mem. at 10 (emphasis added).

**78.** *Id.* at 11.

**79.** *Id.*

Kennedy, Schwartz & Cure, P.C., Arthur Z. Schwartz, for Plaintiffs.

Spivak, Lipton, Watanabe, Spivak & Moss, Franklin K. Moss, Eric Greene, Rochman, Platzer, Fallick & Sternheim, Irwin Rochman, for Defendant.

## OPINION AND ORDER

OWEN, District Judge.

Before me after a five-day bench trial[1] is the latest round in the long-boiling struggle of plaintiff Carlos Guzman[2] against the leadership of his union, Local 32B–32J (the "Local"), and particularly its long-standing president, defendant Gus Bevona. It addresses an upcoming vote on amendments to the Local's constitution which the Local has scheduled for later this month (December, 1997). Local 32B–32J is part of the Service Employees International Union, AFL–CIO, the union of service workers for commercial and residential buildings. The Local's membership, numbering some 60,000 members, spans all five boroughs of New York City as well as Nassau and Suffolk counties and Northern New Jersey, and it is divided into nine separate geographical districts. Its members' are employed as superintendents, doormen, elevator-starters, handymen, porters, security guards, and maintenance workers.

The relevant history begins in 1991 and is best told in the words of District Judge Robert P. Patterson, who made the following findings in *Guzman v. Bevona,* 152 LRRM 2925, 2927–31, 1995 WL 876386 (S.D.N.Y. 1995).

In January and February 1991, Guzman circulated to other Local members a flyer protesting a dues increase voted in December and included the LM–2 information obtained from the United States Department of Labor. It demanded, among other things, a 50% reduction in the salaries of the Local's officers. Guzman also circulated a petition that called for a new vote on the dues increase. Guzman visited more than forty buildings in that time period.

On January 26, 1991, Guzman distributed his flyers and collected signatures for his petition inside and outside the Shera-

---

1. The trial took place on November 24–26 and December 1 and 2, 1997.

2. Here, Guzman is joined by two other plaintiffs, Dominick Bentivegna and Frank Colon, also rank-and-file members of the Local. All three belong to Members for a Better Union ("MBU"), an organization which opposes the policies of the incumbent Local leadership.

ton Centre Hotel at which a shop stewards' meeting was being held.

Defendant Donald Mumm[3] had not known Gus Bevona's salary until he read plaintiff's flyer at the shop stewards' meeting luncheon.

In the three or four days immediately following the shop stewards' luncheon, Bevona found out that Guzman was a member of the Local in a commercial building and had been a shop steward until the previous year.

Several days after the shop stewards' meeting, Bevona learned that Guzman's flyer was being distributed at some buildings and told his administrative assistant, James Lynch, to keep track of plaintiff's visits to buildings.

Lynch kept a written record of where plaintiff's flyers appeared and what the members were saying about them.

In February, 1991, Bevona asked Raab to have Guzman surveilled by a private detective agency and asked Raab to contact [a] law firm and ask for a recommendation of a private detective agency.

The ... law firm recommended to Raab APB Investigations, Inc. ("APB"), a licensed private investigation firm located on Staten Island and owned by a retired New York City detective, John Gaspar. Raab retained APB on behalf of the Union on or about February 22, 1991.

On Thursday, February 28, 1991, Guzman mailed to Bevona copies of his petitions containing around 400 signatures as well as his "Open Letter to Gus Bevona."

On Friday, March 1, 1991, Raab faxed John Gaspar a letter instructing him to begin surveilling Guzman immediately, 16 hours a day (but not during his eight hour work shift) and stating that the surveillance would continue up to March 19, 1991.

Gaspar mailed Raab reports of each day's surveillance and called him regularly concerning the surveillance.

On Saturday morning, March 3, 1991, around 9 a.m. Guzman was in his apartment on the 7th floor of a twenty story public housing project in a Hispanic and black section of the upper west side, when an APB investigator, a large, white, Irish-appearing male knocked on his door and asked if Michael Gonzalez was there. Guzman knew the person was strange to the neighborhood and that there was no reason for anyone to think that Michael Gonzalez lived in his apartment. He watched as the APB investigator left his hallway and took up watch from a car outside his apartment house. About 11 a.m. Guzman's son came to visit and checked on the APB man while he was using a street phone and heard him say, "John, we think he's in there." The APB man told Guzman's son that he was in construction asbestos removal. Guzman's son reported his observations to Guzman, who thought "John" was John Bevona, a union official, and called other neighbors and his cousin, Wilson Sornoza, to watch the man.

Guzman called the housing police who said that it was not against the law for the man to be outside his building. The APB investigator remained outside the apartment all day. About 6 p.m. Guzman saw another man speak with the APB man and take up a position in a car nearer his building and then come up to his apartment and listen at the door. Guzman spoke to his neighbor, Mrs. Gallagher, who reported that she had seen a man on March 2, 1991 outside Guzman's door who had asked her questions about Carlos and that he was the same man who had been outside Guzman's door that morning. Guzman called 911. The police responded to the call and Guzman saw the man leave the area and come back as the police were leaving. Guzman alerted the police who reported to Guzman they had told the man outside to move on. Mr. Sornoza reported to Guzman that the man had merely moved to another position on 104th Street. Guzman, believing the men were "hit men", called 911 again and received a police escort out of his apartment building. He stayed with his wife, became scared for her and his family's safety and moved to stay with other relations.

---

3.   [Footnote by the Court] Mumm was an official of the Local.

On March 4, 1991, Guzman called the union office twice and left messages to call off the surveillance and that he would circulate no more petitions.

On March 4, 1991, Raab wrote a letter to APB ordering the surveillance of Guzman's wife.

On March 5, 1995 [sic], Raab wrote a letter to Guzman which was hand-delivered to Guzman's apartment. It was left at his apartment door. The letter was retrieved by Mrs. Gallagher and redelivered to Guzman. The letter threatened legal action by the Union and its officers if Guzman made false statements. Meanwhile, he learned that the men were showing his picture to neighbors.

The Union had never ordered or approved the surveillance of a rank-and-file member of the Local prior to the hiring of private investigators to surveil plaintiff, although it had ordered the surveillance of a discharged business agent who was suing the Local based on employment-related claims.

On Friday, March 8, Guzman went to see ADA Eliot Spitzer of the New York County District Attorney's office.

On March 8 investigators from the District Attorney's office accompanied Guzman to his apartment building where he pointed out the man in a car who had been watching him on March 3. The District Attorney's investigators approached the second surveillor and were told by the surveillor that he worked for APB. He was told to leave but Guzman's neighbors reported later that the man merely resumed his post from another vantage spot.

On Saturday, March 9, Gaspar himself performed the surveillance.

The DA's office served a grand jury subpoena on APB on or about March 12, 1991 to find out by whom they were employed. Mr. Raab was promptly notified of the service of the subpoena.

On Friday, March 15, 1991, after hearing Defendant Bevona state it was his responsibility to be certain that Guzman was not working for an employer group or competing union and listening to a reading of Mr. Guzman's open letter to Gus Bevona

and Mr. Raab's letter of March 5, 1991, in response thereto, the Joint Executive Board unanimously ratified the previous surveillance of plaintiff and approved the continued surveillance of him until April 21, 1991.... The surveillance ordered was discontinued after March 19, 1991.

On or about March 26, 1991, Bevona asked Raab to resume the surveillance of Guzman and it was resumed by APB on March 26, 1991. On that same day, Asst. District Attorney Spitzer called Bevona's office on the telephone, was referred to Mr. Raab and, after learning of the District Attorney's interest, Mr. Raab ordered the ending of the surveillance.

Before June 11, 1991, numerous new stories about the effect of the surveillance on Mr. Guzman were carried in the news media.

On June 11, 1991, the Joint Executive Board was read letters from Carlos Guzman and his attorney charging a violation of the Landrum–Griffin Act based on the surveillance and calling for corrective action. The Board unanimously confirmed the vote taken on March 15 to surveil Plaintiff.

\*　　\*　　\*　　\*　　\*　　\*

Plaintiff's dissident activities within Local 32B–32J have not been chilled since March 2, 1992.

However, since that time Bevona has continued to take the position that Guzman is a "management front." At trial, he testified to that effect, although four years have passed and he was able to point to no evidence to support such a charge. The use of such remarks in harangues from the podium at union meetings is likely to cause a member criticizing union management to be treated as a "union buster" and create anger in, and incite violence by, some union members. Indeed, on June 25, 1995, outside a union shop stewards meeting, Guzman and an associate were assaulted, without any physical injury occurring, and their leaflets thrown onto the street by unnamed shop stewards. Although shop stewards are appointed by the Defendants, the union undertook no disciplinary action

against the shop stewards responsible for this incident.

\* \* \* \* \* \*

As found by the jury, the surveillance conducted at the behest of the union would have and did have the effect of inhibiting or stifling plaintiff in his free speech rights as a union member . . . .

As found by the jury, the Raab letter on behalf of the union was written for the purpose of, and would have and did have the effect of, stifling plaintiff's free speech rights as a union member . . . .

Plaintiff has suffered harm caused by the defendants' actions justifying an award of $100,000 in compensatory damages, as found by the jury . . . .

\* \* \* \* \* \*

On June 11, 1991, without inquiry or consideration of the Landrum–Griffin Act or their obligations under the union constitution, the Individual Defendants ratified their prior action, although they were aware of the impact the surveillance had on Mr. Guzman. Mr. Bevona testified that he does not read newspapers and, thus, was unaware of the news stories of Mr. Guzman's intimidating experience. His own speech on June 11, 1991, demonstrates he had read news stories and that this testimony was false and misleading.

Defendant Bevona and the union injured and impaired plaintiff's standing and rights in the union by stifling his free speech. By ordering and approving the surveillance and the Raab letter, Bevona took actions with . . . the foreseeable effect of intimidating plaintiff's exercise of his free speech rights.[4] Since plaintiff was chilled in his speech, he was denied full standing and rights as a union member, as required by statute, 29 U.S.C. § 411(a)(2), and Article XV, Section 1 of the International Constitution, and Article II, Section 4 of the Local Constitution, which states: "Every member by virtue of membership in this Local Union is obligated to adhere to and follow the terms of the International Constitution, this Local Constitution and the working rules promulgated in accordance with this Constitution, with respect to the rights, duties, privileges and immunities conferred by them and by statute. Each member shall faithfully carry out such duties and obligations and shall not interfere with the rights of other members." A union member does not enjoy full standing or his legal rights as a union member where he does not feel free to express his political opinions and criticisms.

By retaining APB to engage in a particular act, namely, surveillance 16 hours a day of plaintiff Guzman (those hours while he was not at work) and surveillance of Guzman's wife as well, Local 32B–32J, by its agent, Raab, made APB its agent for that purpose and is responsible for those acts as principal . . . .

By ordering and approving the surveillance, which had the . . . foreseeable effect of inhibiting and stifling plaintiff's speech about union affairs, Gus Bevona individually, and, by ratifying Bevona's actions, all the defendants in their official capacity, violated 29 U.S.C. § 411(a)(2).

By authorizing and approving the Raab letter, which had the purpose and foreseeable effect of inhibiting and stifling plaintiff's free speech, all of the defendants in their official capacity, and Gus Bevona individually, violated 29 U.S.C. § 411(a)(2).

. . . The officers' confirmation on June 11, 1991, of their prior approval of the expenditure of funds for the surveillance after it had become apparent that the union member's free speech would be stifled as a result and without any evidence of plaintiff being an "agent provocateur" was manifestly unreasonable. That the members of the Executive Board approved such expenditure in blind adherence to their leader, without making any inquiry as to the nature or effect of the surveillance or the factual basis for ordering it, is no excuse. Approvals made in this manner are abusive and political in nature.

---

4. [Footnote by the Court] On appeal, the Second Circuit upheld the Court's findings but for its determination, contrary to a jury finding, that Bevona took action with the *purpose* of stifling Guzman's free speech. *See Guzman v. Bevona*, 90 F.3d 641, 647 (2d Cir.1996).

By injuring plaintiff's statutory rights, all of the defendants in their official capacity, and Gus Bevona in his individual capacity, contractually breached the terms of the Constitutions of the International and the Local in violation of 29 U.S.C. § 185(a). An aggrieved union member may seek equitable relief from union officials, as well as the union for actions in contravention of the union constitution, which is binding as a "contract." Plaintiff has proved that the defendants have breached their duties to him under the Union Constitution in infringing his union standing and rights. Defendant's President to this day maintains that plaintiff is a "management front" although four years have passed and he presented not a shred of evidence in support of his statement. Such an attitude is evidence of recalcitrance and a desire to stifle legitimate criticism of the manner in which the union's affairs are conducted making injunctive relief appropriate.

Accordingly, given the factual findings and the conclusions of law set forth above, plaintiff is entitled to:

1. an order and judgment directing payment of damages of $100,000 from Local 32B–32J and Gus Bevona, jointly and severally;

2. an order and judgment directing Gus Bevona and the individual defendants to repay the union $19,343.48;[5]

3. an order directing payment of plaintiff's attorneys fees, litigation, expenses and costs by Local 32B–32J, based on an application to be submitted by plaintiff by November 1, 1995;

4. a permanent injunction enjoining all defendants[6] and Local 32B–32J from (a) ordering or conducting any future surveillance of Mr. Guzman or members of his family; (b) threatening legal action against Mr. Guzman or his political supporters based on his exercise of his free speech rights about union matters; and (c) engaging or directing, or inciting others to engage in physical actions which have the purpose or reasonably foreseeable effect of inhibiting the free speech rights concerning union affairs of plaintiff or his supporters.

Following the above, Guzman, although unsuccessful on the salary reduction and dues increase issues, undaunted, made two unsuccessful runs for the presidency of the Local, one in 1992 and one in 1995. The latter bid along the way gave rise to District Judge Lawrence M. McKenna making the following findings in *Guzman v. Local 32B–32J*, 151 LRRM 2006, 2007–08, 1995 WL 562187 (S.D.N.Y.1995).

> During the period January–April 1995, Local 32B–32J distributed a 142 page book entitled "Sixty Years of Progress" to its entire membership at union expense.... Using a nominal distribution date of mid-February, "Sixty Years of Progress" was distributed to the membership of Local 32B–32J some seven months before the next union election .... [T]he Court ... concludes that "Sixty Years of Progress," which extols Bevona's record in glowing terms and characterizes the Plaintiffs as disruptive and "frivolous" constitutes campaign literature.

Accordingly, the District Court ordered the Local to distribute the plaintiffs' campaign literature to the members at union expense.

Next, in November of 1996, Guzman and the other plaintiffs submitted to the Local a series of proposed amendments to the Local's constitution,[7] requesting that the voting

---

5. [Footnote by the Court] This was the cost of the wrongful surveillance of Guzman.

6. [Footnote by the Court] On appeal, the Second Circuit upheld the relief granted by the District Court but modified the injunction to exclude those defendants who had retired from all association with the Union. *See Guzman v. Bevona*, 90 F.3d 641, 650 (2d Cir.1996).

7. The proposal included five amendments of considerable substance and future effect as to all members. The first amendment would require all collective bargaining agreements "to be ratified by the members of the local who work subject to such agreements. Industry-wide agreements shall be ratified industry wide; agreements with one or more employers shall be ratified by members working for those employers." The second amendment provided for shop stewards to be elected by the members from their shop rather than appointed by the Local leadership. The third amendment would reduce and cap the salaries of all Local officials according to a specific formula. The fourth amendment provided that business agents be elected by members

on the proposals be permitted all day, from 6:00 a.m. to 9:00 p.m., and that if the Local leadership used union resources to publicize their views of the proposals, that MBU's views be given equal dissemination. Pursuant to the Local's normal procedure,[8] the proposed amendments were considered on December 17 by the Local's Executive Board, which recommended that they be rejected. They were then read at the quarterly meeting of the Local's membership on December 30, 1996.

Plaintiffs then came before me for the first time in February, 1997, seeking injunctive relief. They questioned the voting procedure which the Local proposed to use on February 19, 1997 for the amendments—voting at two three-hour membership meetings, one at 2:00 p.m. and one at 6:00 p.m., *after* the business of the meeting was completed. Plaintiffs asserted that the hours would deprive many of the members of the opportunity to vote. On February 14, a Friday morning, I ordered from the bench[9] that the voting take place *continuously* from 2:00 p.m. to 9:00 p.m. "even while the business of a meeting or meetings is being conducted", so that all members, regardless of whether far or near, or which of the many differing shifts they were on, could have a chance to vote. With the voting to take place the following Wednesday, I ordered that notice be given to the membership as soon as possible. "Get notices out orally .... Can you get notices on the boards of these buildings? ... This is so ordered in the minutes. That constitutes the court's order.... Get something up in mimeograph, put it on bulletin boards ...." This order was intended to be immediately complied with, and could have been complied with in the next 24 to 48 hours, but was substantially frustrated because of the Local's foot-dragging. (*See* p. 315, *infra.*)

The voting on the proposed amendments took place, as ordered, from 2:00 p.m. to 9:00 p.m. on February 19, 1997, in the various meeting rooms and the lobby of the second floor of the Sheraton Hotel in Manhattan.[10] To get a ballot, each member first registered by district. Registration for members from Districts 5 and 6 was held in the second floor lobby. The Versailles Ballroom was used for registration for the largest districts, Districts 2, 3, and 4.[11] The registration tables were staffed by "clericals", union employees who were not themselves members of the union. Standing or sitting next to each clerical was one of the Local's "business agents", called "delegates", i.e., union members who had been appointed to representative positions by the Local leadership.[12] Each union member had to show his

---

rather than appointed by the Local leadership. The fifth amendment provided for the creation and administration of a strike fund.

**8.** The procedure for amending the Local's constitution is set forth in Article XVII of the constitution and bylaws. Article XVII provides as follows:

Except as provided in Article XVI, Section 2 and Section 3, any proposed amendment to this Constitution and Bylaws' must be offered by a member in good standing, and shall be submitted in writing to a meeting of the Joint Executive Board for its consideration and recommendations. The amendment and recommendations shall then be read at the next regular meeting of the Local. The amendment and recommendations shall be read again at the next regular membership meeting of the Local and thereupon submitted to vote. To carry any amendment requires the affirmative vote of two-thirds of the membership present, at the second regular meeting of the Local, at which there must be a quorum. If there be no quorum at this meeting, a vote shall be taken at the first following meeting of the Local at which there is a quorum.

No amendment shall be valid or become effective until approved by the International Union.

**9.** A formal, written order to the same effect was issued on February 15, 1997.

**10.** In order to obey this Court's Order, the Local had to deviate somewhat from their usual voting procedure. The ordinary practice of the Local with regard to voting on amendment proposals is to hold the vote at one of its four annual membership meetings. The voting is held after the conclusion of the business of the meeting, which includes regular business as well as a presentation of the Local leadership's views of the proposal and which usually takes between one and two hours to conduct.

**11.** Faced with the chaos, the attorneys for the Local moved the registration for Districts 2 and 3 to another room, the Royal Ballroom, at around 4:00.

**12.** Each district within the Local is further subdivided, and one business agent is appointed for each subdivision.

or her union i.d. card to the clerical; the clerical would then check off the member's name on a computer printout and hand the member a ballot.

The ballots were printed on both sides of an 8½″ × 11″ piece of paper. On one side, the ballot toward its top read, "Proposed amendments to the Constitution and Bylaws of Local 32B–32J have been submitted by three members.[13] THE JOINT EXECUTIVE BOARD HAS UNANIMOUSLY REJECTED THEM AND RECOMMENDS THAT YOU VOTE NO." Underneath that statement was a list of each of the five constitutional clauses to be amended, identified by article number and section number, followed by boxes marked "yes" and "no". On the reverse side, the text of the proposed amendments was printed. The ballots were printed in English only.[14]

While the registration and voting was held continuously in the other rooms, two separate membership meetings were conducted in the Imperial Ballroom. The first meeting began at 2:00, and the Local leadership spoke until 3:30, at which point the floor was opened for debate. The second meeting began at 6:00.

Members could mark their ballots in either the registration area—in which case they would deposit the ballot in a ballot box on the same table at which the registration took place—or the meeting area—in which case they would deposit the ballot in one of several unattended (but for the possible presence of observers) ballot boxes placed on chairs near the doors to the Imperial Ballroom. In either case, there was no place for members to mark their ballots without being under the eyes of any others present.

The voting closed at 9:00 p.m. At that point, close to 5000 votes—a substantial turnout—were tabulated by the clericals in the presence of observers from both sides. Each amendment came close to getting half of the total votes, falling, however, obviously short of the two-thirds required to pass.

Based on the evidence at trial, I conclude that the entire process surrounding the vote on the proposed amendments—the circumstances surrounding the notice of the vote, the opportunity to attend to vote, the form of the ballots, the circumstances surrounding obtaining a ballot, and the intimidation pervading the voting procedure—was so tainted by the Local leadership as to render the vote an unfair one that may have affected the outcome. The tainted aspects include the following:

The initial notice to the membership of the proposed amendments came in the form of an announcement of the membership meeting to be held on December 30, 1996. This announcement was accompanied by the text of the proposed amendments, but no explanation or introduction was included, in spite of the fact that these amendments were of substance and were the first amendments ever to be proposed by a rank-and-file member in opposition to the Local leadership. In addition, the announcement did not include the names of the proponents—individually, or as members of MBU—with the text of the proposals; it stated only that the proposed amendments "were submitted by three members". In fact, the Local leadership avoided doing so because, according to the trial testimony of the Local's chief attorney, Ronald Raab, "they didn't want to give him [Guzman] any more exposure than they were required to give him." On the other hand, the announcement did state—not once, but twice—that the Executive Board had unanimously rejected the amendments.

Members received a second notice of the amendment proposals in the announcement of the February 19, 1997 membership meeting. This announcement, like the one for the previous meeting, also failed to identify the proponents of the proposed amendments while twice noting the Executive Board's negative recommendation.

After I ordered the hours for the February vote to be extended and the members to be expeditiously notified of the extension, the

---

13. Significantly, the names of proponents Guzman, Bentivegna, and Colon were deliberately omitted from the ballot. *See also* p. 314, *infra*.

14. Basically undisputed testimony established that a sizable minority of the Local's members speak only Spanish.

Local's attorneys and leadership dawdled almost four days in getting out notice to post in the many buildings telling of the new, extended voting hours. In my Order, which I issued before 11:00 a.m. on Friday, February 14, I directed the Local to give notice to the members in a timely fashion. However, in spite of the Local's ability to prepare, xerox, and start distributing the notice that very day,[15] the bulletins were not run off until the next day and were not distributed to business agents for posting until four days later, sometime during the day on Tuesday, February 18, the day before the vote. No proof was offered as to how many of those bulletins were actually posted. However, the Local's Vice President, James Lynch, who did the xeroxing of the bulletins to be given to the district chairmen, testified that he does not remember what he did with respect to giving anything to the chairmen of Districts 1 and 8, the New Jersey and Long Island districts, and at least one business agent, Danielle Sistrunk of Suffolk County, acknowledged in her deposition that she posted no bulletins whatsoever in any building.

In addition, the content of the bulletin itself was not phrased very pointedly on the very issue for which it was being disseminated. The most important information for it to contain, pursuant to my Order, was that the voting hours had been extended and what they were. However, most of the text of the bulletin, faxed by Raab to Lynch, was a restatement of the old information about the membership meetings. The new information was couched in the following sentences: "The first meeting will begin at 2:00 p.m. and the second meeting will end at 9:00 p.m. For your convenience, votes may be cast during the entire period."

Even in spite of the somewhat extended voting hours ordered by this Court, many members were unable to vote. Members' shifts start at a variety of times; many who work the afternoon shift start at 4:00, and a significant number begin at 3:00.[16] Considering the time it takes to travel to work—and for those members who work in the Long Island districts, that travel time is great—2:00 was simply not early enough for a significant number of members to participate.[17] A breakdown of the February 19 voting by section and district reveals that, from most districts, approximately 8% turned out to vote. However, only 6.14% turned out from the Queens district, and only 1.35% of the

**15.** I note in this regard both the statement of the Local's Vice President, James Lynch, that "[w]e often distribute literature very quickly" as well as the fact that the Local's counsel was able to call in at least nineteen of the business agents—the same business agents to whom fell the responsibility for posting the notices of the extended voting hours—to testify at this trial on overnight notice.

**16.** Neither side introduced any definitive, completely accurate breakdown of the different shift hours and the number of members working those shifts. One such breakdown, generated by plaintiff Guzman as a result of his own experience travelling around the districts and talking to members, is the best that was offered, and I credit its reliability to a fair extent. Defendant, through Vice President Lynch, offered his own schedule, the reliability of which was so undermined on voir dire that it was excluded. As a possible remedy for this exclusion, I granted leave to defendant to call in a string of business agents to testify to the working hours of the members in their sections. This, however, succeeded only in proving that no one in the Local leadership knows exactly how many of its members are working on any given shift. Further,

whereas Local Vice President Lynch testified before me that the rejected schedule had listed *all* workers' schedules for the time period, business agents who later testified said they had been instructed not to list or report any buildings with less than ten members. Some of those, it appears, would have had working schedules within the time period that would have rendered their voting most difficult to achieve.

**17.** While several witnesses testified that they had taken sick days in order to attend the vote and had suffered no penalty or other adverse affect as a result, I do not think it is reasonable to require any member to give up one of his sick days (which may later be needed) in order to participate in the Local democratic process. Nor, considering that the Local should value each member's participation, should the Local expect any member to do so.

Raab testified that the Local's contract for the current year for residential employees allowed each member to take one "personal" day each year. I noted at the time that the idea that a member should devote his single, annual "personal" day to attending a meeting rather than enjoying the company of his family or some other pleasure is hardly credible or even desirable.

members from the Long Island district voted.

The conditions in the main voting room at the February 19 meeting were such that it was characterized as "chaotic". It was over-crowded—even jammed, as snapshots put in evidence showed—resulting in confusion as well as long lines. A Local shop steward testified that it took him as long as an hour to get through the registration line. A photograph shows security personnel linking arms to hold back the members.

The registration process was conducted not only by the Local's clericals, but by Local officials, the business agents, who, since one of the proposed amendments would have jeopardized their appointed positions, had a personal stake in the outcome of the election. Their presence at the registration tables, ostensibly to help the clericals identify members and speed the process along,[18] however served as a reminder to members of the presence and views of the Local leadership. In a meeting with Raab the day before the vote, the plaintiffs expressed their concern that the presence of the business agents, "cheek by jowl" with the clericals, as the photographs later showed, would intimidate the members, but they were rebuffed by Raab.[19] Plaintiffs also asked if they could place some of their representatives behind the tables along with the business agents, but that request was denied.

The voting procedure provided no way for members to vote with anything approaching secrecy or even relative privacy. Most members marked their ballots at the registration tables, under the eyes of their business agents. Members were not told that they could leave the registration room to vote and cast their ballots. Even if a member chose to leave the registration area to mark his ballot, he might still run into another Local official; one member, Amandou Dia Faye, testified to going away to a table yet finding himself marking his ballot in the presence of his shop steward, Mark Zurich. Zurich was the only person who knew that Dia Faye had voted in favor of some of the amendments, but after the day of the vote, Dia Faye was approached by another co-worker in Zurich's "shop" who told Dia Faye that he knew that Dia Faye had voted "against the union".

Not only were Local officials present all through the voting area, but they also stated their position on the proposed amendments even as they exercised official duties. Most Local officials wore "No" stickers which had been distributed to them between the afternoon and evening meetings. Business agents and other Local officials openly advised members to vote "no". One Executive Board member, Joseph Dumlao, testified at his deposition that he told over 200 members that the Board recommended that members vote "no".

It hardly needs belaboring that since members depend on business agents and shop stewards to help them when they have grievances in the course of their employment, members could be understandably hesitant to alienate these officials of the Local. Because two of the proposed amendments would, if passed, mean that business agents and shop stewards would thereafter be elected by members rather than going forward under their appointments by the Local's leadership, a member risked alienating them by casting a "yes" vote. Thus, the presence of numerous officials while members voted, combined

18. I note that this procedure by which the business agents facilitated the registration process by identifying members known to them personally had one significantly notable failure. Strum testified that "[e]ach business agent basically knows the people that . . . he or she is responsible for." However, plaintiff Guzman's wife, Lida Guzman, testified that she had forgotten to bring her i.d. and that she was not allowed to register until her husband went home and got it for her. It seems unlikely, given the exposure of Guzman and his wife to the Local's leadership (*see* excerpt from *Guzman v. Bevona*, 152 LRRM 2925, 1995 WL 876386 (S.D.N.Y.1995), pp. 308–12, *supra*), that

Mrs. Guzman's own business agent would fail to recognize her. Attorney Raab testified that "[i]f her business agent knew her and gave her a hard time, there is absolutely no excuse for that. That's not what was supposed to happen, that's not what the business agents were instructed, and if it happened it clearly shouldn't have happened."

19. Later in the day, long before voting had ended, these business agents put "No" stickers on their lapels as the adjacent clericals were registering members and handing out ballots. (*See* p. 316, *infra*.)

with their frequent, clear statements—visual and vocal—of the Local's position, created in the voting area an atmosphere of coercion and intimidation.[20]

The ballots prepared by the Local were themselves confusing. Using a single sheet, the text of the amendments was printed on the reverse side from where the boxes were to be marked. An expert in union voting, Daniel Clifton, testified as to the infirmity:

> It's certainly not because voters are stupid, but there might be a tendency [for] some people just trying to do it fast or not understanding or not reading the directions not to turn it over, not to realize that you have to do something on the other side of the page.

In addition, as observed above, the ballots were printed entirely in English. Plaintiff Guzman testified that more than half of the Local's membership had Spanish as their principal language and that of that half, approximately 80% spoke Spanish as their *only* language.

The voting areas were unsupervised, allowing for the possibility of fraud. Because of the crowding, some members handed their ballots to other members to be taken forward to be placed in the ballot boxes; witnesses testified to seeing members do so, and one photograph shows a woman placing more than one ballot in the ballot box. Because this practice of placing more than one ballot in the box went unchallenged, a fraud could have been perpetrated by anyone getting possession of more than one ballot. And at least one person did: plaintiff Guzman observed a male member giving ten blank ballots to a female member who stuffed them in her purse. Guzman informed Ira Sturm, one of the attorneys for the Local, who responded by returning the ballots to the registration table from which Guzman believed it had come with a caution to the business agent to make sure that no one took any extra ballots.

While the Local, through its lawyers, nominally encouraged plaintiffs and other MBU supporters to serve as observers, the observers were met with hostility. Early in the afternoon, when the observers were trying to inspect the set-up, plaintiff Guzman noticed a box on the table for the Upper West Side section of District 6. When Guzman asked to look inside the box, the Local's business agent for the section, Kyle Bragg, got upset and told Guzman "mother f-cker, I'll f-ck you." Only when attorney Raab was summoned was Guzman allowed to inspect the box, which turned out to contain only some flyers on medical information.

Plaintiff Bentivegna also encountered hostility from a union official. As Bentivegna moved to watch the voting, one of the district chairman, Enzo Stellato, blocked his way. According to Bentivegna, "[Stellato] stood right in front of me, and I put my left hand on his, just a little tap, and I said, 'My friend, excuse me,' and he looked at me, and I wish I can yell as loud as he yelled—I'm sorry.... He said 'I'm not your f-cking friend.'" Stellato continued to block Bentivegna's path until a higher official of the Local came and moved Stellato along.

Thereafter, following the said February defeat, on March 17, 1997, plaintiffs resubmitted to the Local their proposed constitutional amendments, in revised form, along with three new amendments, so that the proposals might again be put to a vote of the membership. The next day, March 18, plaintiffs filed the amended complaint in this action in which they requested declaratory relief with respect to the February vote and injunctive relief with respect to the upcoming vote. Their claims were brought under the

---

**20.** The Court is not overlooking the fact that electioneering by proponents' advocates also took place in the voting areas. Many proponents wore "Yes" stickers on their lapels throughout the day, and at least one handed out leaflets inside the hotel, in spite of repeated warnings from Sturm, the Local's attorney, to plaintiff Bentivegna. While I note that this does not flow from the same coercive foundation as the opposition, its impermissibility under the circumstances is dealt with hereafter.

On the other hand, while Lida Guzman, the small-statured wife of plaintiff Guzman, was permissibly handing out supporting leaflets on the sidewalk outside the hotel where the meeting took place, a group of three or four men, including a business agent and a shop steward, came up to her, asked her what she was distributing, and cursed at her.

Labor–Management Reporting and Disclosure Act of 1959 (the "LMRDA"), also known as the Landrum–Griffin Act, codified at 29 U.S.C. § 411 et seq. Plaintiffs asserted three causes of action in their amended complaint: (1) that by conducting the February 19 vote and future votes at a time when a substantial number of members could not attend, the Local denied the members their right to vote under Section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1); (2) that by publishing a negative recommendation regarding the proposed amendments in the Local newspaper without publishing the text of the proposed amendments themselves and without allowing plaintiffs an opportunity to respond at union expense, the Local denied the members their right to an informed vote under Sections 101(a)(1) and (2) of the LMRDA, 29 U.S.C. §§ 411(a)(1) and (2); and (3) that by the procedure used to carry out the February vote, which composed a part of a continuing effort to chill the exercise of democratic rights by the members, the Local had so tainted the vote that it had violated the members' right to vote under Section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1).

In an opinion dated August 1, 1997, while I dismissed the second cause of action. I allowed the other two causes of action to stand, however, concluding that they stated claims cognizable under the LMRDA. I held that:

> A fair referendum assuring the equal right to vote under § 101(a)(1) includes the right of members to have the vote scheduled at a time when they can exercise their vote and the right to be free from intimidation or fear of reprisal from union officials— and the courts in this circuit have not been reluctant to act when faced with the responsibility for vindicating such rights.

*Members for a Better Union v. Bevona,* 972 F.Supp. 240, 244 (S.D.N.Y.1997) (hereinafter "*MBU I*"). The remaining causes of action are governed by § 101(a)(1) of the LMRDA, which provides that:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend mem-

bership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1).

■ As a threshold matter, defendant claims that plaintiffs lack standing to bring this suit because they all, admittedly, voted in the election and therefore were not deprived of their right to vote. However, I conclude that there are not one but two bases on which these plaintiffs have standing to sue. Plaintiffs may sue on their own behalf to vindicate their rights under § 101(a)(1). As one of the first district courts to interpret the LMRDA held, the equal right to vote guaranteed by § 101(a)(1) must consist of more than "the mere naked right to cast a ballot". *Young v. Hayes,* 195 F.Supp. 911, 916 (D.D.C.1961). Indeed, I agree with the D.C. Circuit that "the right each member has to vote must be meaningful." *Bunz v. Moving Picture Machine Operators' Protective Union Local 224,* 567 F.2d 1117, 1121 (D.C.Cir.1977). In this instance, the Local leadership engaged in a variety of forms of intimidation, discussed above, which may have dissuaded a substantial number of members from voting in favor of the proposed amendments. Against that backdrop, the fact that these three plaintiffs succeeded in casting their votes does not mean that the votes they cast were meaningful; their votes would be meaningful only in the context of a fair vote, reasonably accessible to all. I adhere to my earlier view that "Guzman, Bentivegna, and Colon as voting members of the Local, have an obvious stake in the outcome of any vote and any alleged voting irregularities ... affect any outcome and therefore work a violation of LMRDA § 101(a)(1), directly affecting the rights of all individual members." *MBU I,* 972 F.Supp. at 246.

■ In addition, this case is one of those unusual instances in which plaintiffs may appropriately assert the rights of third parties. Although, as a general rule, a plaintiff who desires to vindicate the rights of a third party is denied standing to sue, that denial is "only a rule of practice". *Barrows v. Jackson,* 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97

L.Ed. 1586 (1953). The Supreme Court has held that plaintiffs may assert third-party standing where (1) the plaintiffs have ·suffered injury in fact, (2) the plaintiffs have a close relationship with the third party whose rights have been infringed, and (3) the third party is unable to assert his or her own rights. *See Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991); *see also Singleton v. Wulff,* 428 U.S. 106, 114–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976). Here, plaintiffs have suffered injury in fact because the voting process did not take proper account of the. substantial distance many members would have to travel, the voting hours did not take account of the multitude of shifts the members worked, and the intimidation—subtle and. not-so-subtle—which chilled choice. Because all of these factors could have affected the outcome of the vote, the amendments which plaintiffs proposed were not fairly put to the membership. Thus, the rights that plaintiffs would assert (aside from their own rights according to the expanded view discussed above) belong to other Local members who were not able to exercise their § 101(a)(1) rights because they were disadvantaged and intimidated by the Local leadership.[21] The plaintiffs, as the proponents of the amendments, have a close relationship with these would-be supporters who are unable to assert their own rights because the same intimidation which prevented them from voting also prevents them from bringing suit on their own behalf. I therefore find that these plaintiffs have standing to assert the rights of other Local members under § 101(a)(1).

Turning to the merits, it needs no citation to support the principle that a reasonable opportunity to attend the polling place, and once there, the ability to vote knowledgeably and according to one's true desire, free from intimidation and risk of retribution, is at the heart of the law in any voting situation. While acknowledging that we live in a world

that is far from perfect, the law must seek to create a climate that is as close to perfect as possible.

■ As to governing precepts here, to obtain a permanent injunction, plaintiffs must establish both a prior violation of law and "a real and immediate threat that the injury will be continued or repeated". *Socialist Workers Party v. Attorney Gen. of U.S.,* 642 F.Supp. 1357, 1425 (S.D.N.Y.1986) (citing *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Plaintiffs have clearly met their burden of establishing the prior violation. Since at least 1991, *see Guzman v. Bevona,* 152 LRRM 2925, 1995 WL 876386, *supra,* the Local has violated the rights of its members, including plaintiffs, to equal participation in its affairs guaranteed by § 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1).

I find as well that there is a genuine threat of future injury. Defendant Bevona called attorney Raab to give testimony before me regarding the upcoming vote. According to Raab, the Local plans to hold the next vote at a meeting in a single large auditorium, into which the members, upon identification, would enter· and be seated; the voting would take place in the· Local's usual manner—at two separate meetings only, as opposed to continuously, as I had ordered for the February vote. The meeting is to begin with an abbreviated version of the usual Local business, followed by a report of the Executive Board's recommendation on the proposed amendments, *after which* ballots would be passed to members at their seats by 1:30 for the 12:00 meeting, which would end at 3:00. A second meeting would start at 6:00 with ballots being handed out by 7:30 after the same Local business (see above), the meeting ending at 9:00.[22] At both meetings, the members would mark their ballots at their seats or elsewhere in the auditorium—but without provision for secrecy—and then drop

---

**21.** This climate of intimidation distinguishes the instant case from other cases where the courts did not find standing and did not look to the possibility of third-party standing. *See, e.g., Mamula v. United Steelworkers of America,* 304 F.2d 108 (3d Cir.1962), *Ellis v. Civil Serv. Employees Ass'n, Inc.,* 913 F.Supp. 684 (N.D.N.Y.1996).

**22.** Defense trial attorney Moss stated this early on, and this was not basically disavowed by Raab.

their ballot envelopes in ballot boxes at the exits as they leave. The registration process would be eliminated by using instead a ballot envelope on which members would write their registration information. Raab justified this plan based on the fact that the Local's constitution calls for the vote to take place at a "meeting": [23] "The amendment and recommendations shall be read again at the next regular membership meeting of the Local and thereupon submitted to vote." [24]

I find this plan to be wholly inadequate. Given the intimidation that I conclude took place at the February vote, where members could at least vote in a room separate from the meeting room (albeit one filled with Local officials and lacking any provision for privacy), the Local's plan for the upcoming vote has the potential to be even more intimidating. Raab testified that ballots would be handed out after the presentation by the Executive Board and that no member who arrives late to the meeting, *after* the presentation by the Executive Board, would be given a ballot, even though the meeting might have as much as an hour to go. Accordingly, I conclude that the plan in totality presents a threat of future injury to the rights of the members, including the plaintiffs, under § 101(a)(1), similar to the past. This is sufficient to enjoin its execution. As the Second Circuit has said in an analogous situation, "surely we need not wait until the meeting is held and the members have been suppressed in the exercise of their statutory rights." *Navarro v. Gannon,* 385 F.2d 512, 520 (2d Cir.1967).

I am fully aware of the Second Circuit's mandate to exercise restraint in this area. Only where there is clear and convincing proof that the union action . . . was part of a purposeful and deliberate attempt by union officials to suppress dissent within the union should the federal court act under the LMRDA. Otherwise we are bound to adhere to our longstanding policy in the internal affairs of unions, which are best left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act.

*Newman v. Local 1101, Communications Workers of America, AFL–CIO,* 570 F.2d 439, 445–46 (2d Cir.1978) (internal quotations and citations omitted). However, where union officials have continuously heretofore attempted to suppress dissent, as has happened here, the courts of this district have not been hesitant to order appropriate relief. *See, e.g., Jiminez v. Briody,* 134 LRRM 3119, 1990 WL 300323 (S.D.N.Y.1990), *Fight Back Comm. v. Gallagher,* 120 LRRM 2372, *amended,* 120 LRRM 2688, 1985 WL 56770 (S.D.N.Y.1985). I find that such action is called for here. In general, union voting is almost sui generis since it is recognized that there is an enormous risk of abuse of power by the incumbent leadership.[25] Here, there have been abuses of power that resulted in an inadequate notice of the vote in terms of both its hours and its substance, a lack of access to the vote for substantial numbers of members in terms of its location and hours, a ballot troublesome in form and content, and most troubling of all, a pattern of intimidation of voting members by the Local leadership, all causing the February 19, 1997 vote to have been conducted in violation of the rights of the members of Local 32B–32J, including plaintiffs, under Section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1).

---

**23.** The Local's constitution (*see* n. 8, *supra*) provides that any vote on amendments to that constitution be held at a "meeting"—whatever that general term means—which the Local contends requires it to be in a room under the voice of the Local's leadership conducting the "meeting". Whatever sacrosanctness the word "constitution" evokes in many circumstances, against the background here, the Local's constitution may not be invoked to assist entrenched incumbency in the face of the LMRDA's mandate of a fair vote. *See* p. 318, *supra*. And I note that it was the Local, not the Court, that set up the voting in

rooms adjacent to the "meeting" in the February 19, 1997 vote; the Court had only extended the hours of the vote.

**24.** I note that for a vote in 1995, the union established nine separate voting locations, all the way to the Suffolk county line.

**25.** *See, e.g., Wirtz v. Hotel, Motel and Club Employees Union,* 391 U.S. 492, 499, 88 S.Ct. 1743, 1748, 20 L.Ed.2d 763 (1968), discussing "the abuses of entrenched leadership that the LMRDA was expressly enacted to curb".

Due to the exigencies of time, the trial ending only thirteen days ago, and the mechanics of finding places for and setting up a proper vote requiring time and advance planning, the meeting for the vote on the proposed amendments will not be held in December, but in January of 1998.[26] At a conference hereafter, the Court will determine an appropriate date in January for the vote. That vote will be conducted by the American Arbitration Association ("AAA"), which is skilled and available for that purpose. A further conference with the Court will be scheduled, once the Local has engaged the AAA,[27] at which the Court, the parties, and the AAA will iron out the details of the voting procedure in conformity with the letter and spirit of the Court's order herein, which shall include the following.

The January vote shall be held at three separate locations: one in midtown Manhattan, one in the Bronx, and one on Long Island in the vicinity of the Nassau/Suffolk County line. The hours of the vote shall run from 6:00 a.m. to 9:00 p.m. The entire process shall be conducted solely by the AAA. Local officials and representatives of the proponents may be present as observers only. A membership meeting may be held at the voting location, but the voting itself shall take place in a separate room in which there are to be no statements or exhibitions of points of view by either side, including discussion, leafletting, and the wearing of buttons or badges.

The vote shall be by secret ballot.

Material shall be printed on one side of the ballot only. The ballots shall be so printed that the text of each proposed amendment appears next to the boxes to be marked as roughed-out below. In addition, a Spanish translation of each individual amendment shall appear directly beneath the English version, and the two versions shall share one choice of boxes, in form as follows:

| | yes | no |
|---|---|---|
| The English text of the first proposed amendment. La traducción al Español de la primera enmienda propuesta. | ☐ | ☐ |
| The English text of the second proposed amendment. La traducción al Español de la segunda enmienda propuesta. | ☐ | ☐ |

The recommendation of the Executive Board shall not appear on the ballot. The paper on which the ballot is printed shall be as large as necessary in order to accommodate the entire text in a legible type size. A sample of the proposed ballot is to be submitted to the Court for its consideration no later than two weeks before the date of the vote.

Finally, the membership shall be given notice of the date, hours, and location of the meeting at least three weeks in advance. This notice shall include the text of the proposed amendments as well as the names of their proponents. It shall not include any reference to the recommendation of the Executive Board.[28]

The foregoing constitutes my findings of fact and conclusions of law and is so ordered.

26. *See, e.g., Moran v. Walsh,* 759 F.Supp. 1067 (S.D.N.Y.1991).

27. The Local has represented through attorney Raab that it can afford the AAA's services.

28. This is not intended to in any way limit the rights of either the proponents or the Local from separately informing members of their views.